Russell Floyd Lindquist
russ.lindquist@yahoo.com
19695 Embers Ave.
Farmington, MN, 55024
949-880-6136
Plaintiff Pro Se

**FILED**

CLERK, U.S. DISTRICT COURT

**12/26/24**

CENTRAL DISTRICT OF CALIFORNIA

BY_____CS_____DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Russell Floyd Lindquist, | **Case No.: 2:24CV7735** |
| Plaintiff, | **First Amended Complaint** |
| vs. | |
| Purdue Global Law School, | **Jury Trial Demanded** |
| Purdue University Global, | |
| Larasz Moody-Villarose, | |
| Martin Pritikin, | |
| Melissa Prichard, | |
| Carolyn Nordstrom, | |
| Defendants | |

## INTRODUCTION

Plaintiff Russell Floyd Lindquist seeks judgment for compensatory and injunctive relief, and exemplary damages, based on (1) breach of contract, (2) defamation, and (3) violation of title-six civil rights.

i

# CONTENTS

AUTHORITIES ...................................................................................iii

JURISDICTION AND VENUE.............................................................iii

PARTIES .........................................................................................iii

I.    FACTS ..................................................................................... 1

II.    CLAIMS................................................................................... 5

Claim #1: Breach of Contract: Racial and Sexual Discrimination ... 5

Claim #2: Breach of Contract: Failure to Intervene in Discrimination ..................................................................................... 6

Claim #3: Breach of Contract: Wrongful Dismissal........................... 7

Claim #4: Breach of Contract: Failure to Intervene in Wrongful Dismissal............................................................................................. 7

Claim #5: Breach of Contract: Moody's Retaliation........................... 8

Claim #6: Breach of Contract: Failure to Intervene Against Retaliation............................................................................................ 9

Claim #7: Breach of Contract: Prichard's Retaliation ..................... 10

Claim #8: Breach of Contract: Failure to Intervene Against Retaliation.......................................................................................... 11

Claim #9: Defamation ....................................................................... 12

Claim #10: Violation of Title-Six Civil Rights.................................. 12

III.    RELIEF ................................................................................. 13

# AUTHORITIES

**Statutes**

1964 Civil Rights Act. 42 U.S.C. § 2000d et seq.................................. 12

28 U.S.C. § 1331 ................................................................iii

28 U.S.C. § 1391(b)(2)...........................................................iii

42 U.S.C. § 2000d et seq....................................................iii, 12

**Other Authorities**

Restatement (Second) of Contracts § 1 ..................................................5

Restatement (Second) of Contracts § 203 ...............................................5

Restatement (Second) of Torts § 559 ..................................................12

# JURISDICTION AND VENUE

1. This court has jurisdiction. 28 U.S.C. § 1331. Federal-question jurisdiction arises under Title 6 of the 1964 Civil Rights Act. 42 U.S.C. § 2000d et seq. Venue is proper under 28 U.S.C. § 1391(b)(2) because the acts and omissions giving rise to the claims occurred at Concord Law School (now Purdue Global Law School), located at 2029 Century Park E Suite 400, Los Angeles, CA 90067.

# PARTIES

2. Plaintiff Lindquist is at 19695 Embers, Farmington, MN, 55024.

3. Defendant Purdue Global Law School (PGLS) is a CA law school.

4. Defendant Purdue University Global (PUG) is the parent-school of PGLS.

5. Defendants Moody-Villarose, Pritikin, and Prichard work at PGLS.

6. Defendant Nordstrom works at PUG.

7. All individuals are sued in their respective official capacities.

# I.   FACTS

8.   Defendant Purdue University Global (PUG) is a school that receives federal funding. Defendant Purdue Global Law School (PGLS) is a California-based child-school of PUG and receives federal funding.

9.   From 2019 to May 2020, Lindquist contracted with PGLS (then Concord Law School), on partial scholarship, to be a student at the law school. As a PGLS student, Lindquist received almost entirely A-grades.

10.   *Moody-Villarose's Warning to Lindquist.* During the first week of May, 2020, Defendant Moody-Villarose (hereinafter "Moody"), PGLS Associate Dean, messaged Lindquist through the school's messaging system and issued a Code of Conduct Warning ("Moody's warning") to Lindquist, citing various statements by Lindquist that were part of Lindquist's research and analysis as a law student at PGLS. Moody's warning contained several unprofessional references to race and sex, and mischaracterized, as racist and sexist, various assignment submissions by Lindquist that were received by Lindquist's instructor in Criminal, Tort, and Contract law: Shandrea Williams, a black woman. Williams never warned Lindquist about the content or tone of any of Lindquist's submissions. Rather, Williams sometimes singled out Lindquist's submissions for praise. Indeed, Williams praised more than one of the very submissions that Moody's warning mischaracterized as racist and sexist. Moody indicated to Lindquist that the bases for Moody's warning were Lindquist's race, ethnicity, and sex – as perceived by Moody: that Lindquist is male, not Irish, and not Puerto Rican. To wit: a criminal-law submission by Lindquist analogized from *West Side Story* – a famous remake of Shakespeare's even more famous *Romeo and Juliet.* Lindquist's

1

analogy descriptively referenced the two key ethnicities featured in *West Side Story*: Puerto Ricans and Irish. Moody's warning charged that Lindquist's mention of the Irish and the Puerto Ricans – was racist. Moody's warning also charged that Lindquist's descriptive mention of a theoretical woman – was sexist. Moody's warning contained several other unreasonable and absurd accusations. For example, Moody's warning cited, as grounds for misconduct, Lindquist's response to a question in a Tort law class that asked student's opinion about the constitutionality of strict liability. As part of his response, the part cited as misconduct, Lindquist indicated his belief that strict-liability is unconstitutional and indeed "tyrannical," since, Lindquist explained, strict-liability arises without proof of bad faith, much less negligence or *mens rea*. (Coincidentally, in law school after PGLS, Lindquist held the same view, expressed that view – and then was simply explained, by his law professor, some of the benefits of strict liability. So, now Lindquist's view of strict liability has lightened – though he still believes that strict liability is unconstitutional.)

11.   *Grievance*. Lindquist immediately filed a grievance ("the grievance"): about the racial and sexual discrimination – and every basis of Moody's warning: all of which, Lindquist contended, were patently unreasonable, and many of which, Lindquist contended, were patently absurd (such as citing, as misconduct, Lindquist's assignment-answer stating Lindquist's belief that strict-liability is "tyrannical"). Lindquist filed the grievance with PGLS's Office of Student Relations, via the school's messaging system, as advised by PUG's terms. *See* PUG Catalog 13.

12.   *Dismissal.* Moody immediately, personally, and unilaterally dismissed Lindquist from PGLS ("the dismissal") – and cited the grievance as the dismissal's basis.

13.   *Notice to Defendant Prichard.* Circa June 9, 2020, through PGLS's messaging system, Lindquist reported Moody's conduct to PGLS's Office of Student Relations: the process outlined in PUG's terms. *See* PUG Catalog 13. The report including the following notifications: (a) the exact list of charges contained in Moody's warning; (b) that Moody unilaterally dismissed Lindquist from PGLS; (c) that Moody cited the grievance as the dismissal's basis; (d) that PGLS's Student Bill of Rights lists various terms of PGLS's contract with students, including that potential dismissal from the school requires the student to receive a hearing with a neutral panel; (e) that no such hearing with a panel ever occurred for the matter; (f) that PGLS and PUG's status, as school that receive federal funds, requires PGLS and PUG to comply with Title VI's prohibition against discrimination about actual or perceived race, ethnicity, and sex; and (g) that Moody's warning, and its stated bases, discriminated against Lindquist on the basis of race, ethnicity, color, and sex. Prichard, Administrator of PGLS's Office of Student Relations, responded to Lindquist's message. Pritchard refused to remedy the dismissal – and instead scolded Lindquist for the grievance about Moody's conduct.

14.   *Notice to Defendant Pritikin.* Circa June 9, 2020, through PGLS's messaging system, Lindquist reported Moody's conduct to Moody's supervisor: PGLS President and Dean Pritikin.  The report to Pritikin included the exact notifications stated in paragraph 13 above, as well as

notice that Prichard (Pritikin's subordinate) addressed Lindquist's grievance only by scolding Lindquist for the grievance's tone. Pritikin never answered Lindquist's message nor remedied the conduct.

15.   *Notice to Defendant Nordstrom.* Circa June 9, 2020, through PUG's messaging system, Lindquist reported to Moody and Pritikin's supervisor at Purdue University Global: PUG Vice President Nordstrom. The report to Nordstrom included the exact notifications stated in paragraph 13 above – and included these notifications also: (a) that Prichard addressed Lindquist's grievance only by scolding Lindquist for the grievance's tone, and (b) that Pritikin had failed to remedy Moody and Prichard's conduct. Nordstrom never answered Lindquist's message nor remedied the conduct.

16.   *Application to Trinity Law School and Tentative Scholarship Offer.* Circa August, 2020, Lindquist applied to Trinity Law School (TLS). Based on Lindquist's academic record, TLS tentatively offered Lindquist a scholarship ("the offer"): 100% of tuition and a monthly stipend of $1,500 per month for the four years of online law school. TLS's offer was contingent upon TLS's receipt of a satisfactory law school report about Lindquist from the Law School Admission Council (LSAC).

17.   Lindquist's LSAC report contained (and still contains) a statement by PGLS indicating that PGLS had duly dismissed Lindquist from PGLS for bad conduct.

18.   TLS revoked the offer – and told Lindquist that the sole basis for the revocation was PGLS's statement in Lindquist's LSAC report.

4

## II.   CLAIMS

19.   *Contracts, generally*. A contract is promise that creates legal duty. Restatement (Second) of Contracts § 1. The interpretation of a contract should "give[] a reasonable, lawful, and effective meaning to all the terms." *Id.* § 203.

20.   *PUG's Terms*. Here, PUG is the parent-company of PGLS and the overall employer of all individual defendants, so PUG's express terms are dispositive. All breach-of-contract claims for this suit arise under PUG's 2019 Academic Catalog: the section on Student Rights and Responsibilities, especially the Student Bill of Rights (hereinafter "PUG Catalog").

### Claim #1: Breach of Contract: Racial and Sexual Discrimination
### (As against Moody, in her official capacity)

21.   PUG's terms include, *inter alia*, protection against "unlawful discrimination on the basis of race, sex, . . . [and] color." PUG Catalog 13. PUG's terms govern Moody's conduct because Moody is an employee of PGLS, which operates under the terms of its parent-school: PUG. Here, Moody's warning included references to Lindquist's actual or perceived race, sex, and color. A reasonable jury could believe that no reason existed for Moody's references to Lindquist's actual or perceived personal traits, except that the traits factored into Moody's warning. Therefore, since Moody acted officially, there is cause to litigate whether Moody's warning breached the contract as racial and sexual discrimination that contravened Lindquist's under PUG's express terms included above in this claim.

5

**Claim #2: Breach of Contract: Failure to Intervene in Discrimination (As against Pritikin, Prichard, and Nordstrom, in their official capacities)**

22.    PUG's terms include, *inter alia*, protection against "unlawful discrimination on the basis of race, sex, . . . [and] color." PUG Catalog 13. The terms also include the right to report discrimination to "any administrator," *id.* – who then presumably has a duty to act in good faith in handling the report. The terms also expressly cite PGLS's Office of Student Relations as where a student should address grievances about faculty and staff. *Id.* Here, Pritikin, Prichard, and Nordstrom administer at PUG or PGLS, and each received personal notice, from Lindquist, of Moody's racial and sexual discrimination, *supra*, paras. 13-15. Yet, Pritikin, Prichard, and Nordstrom, each and all, decided against intervening to remedy the conduct. *Id.* Instead, Prichard scolded Lindquist for the "tone" of Lindquist's grievance against Moody's racial and sexual discrimination. *Supra*, para. 13, ln. 22. A reasonable jury could find a duty to intervene existed for these defendants – and that the duty to intervene was *not* met by Pritikin and Nordstrom's refusal to do anything, nor by Prichard scolding of Lindquist about Lindquist's grievance against Moody's racial and sexual discrimination. Therefore, since Pritikin, Prichard, and Nordstrom acted officially, there is cause to litigate whether the failure to intervene against the racial and sexual discrimination breached the contract by contravening Lindquist's rights under PUG's express terms included above in this claim.

6

## Claim #3: Breach of Contract: Wrongful Dismissal

### (As against Moody, in her official capacity)

23.    PUG's terms include, *inter alia*, due-process. PUG Catalog 17. PUG's terms do not explicitly state what constitutes due process. But here, the extent of due process received by Lindquist, vis-à-vis the dismissal, was for Moody to immediately and unilaterally dismiss Lindquist from PGLS – the day after Moody read Lindquist's grievance against Moody's racial and sexual discrimination. A reasonable jury could find that due process did not *arise* in this matter by the next-day unilateral dismissal of Lindquist by the administrator who was the subject of Lindquist's complaint about racial and sexual discrimination. Therefore, since Moody acted officially, there is cause to litigate whether the dismissal breached the contract as a due-process violation that contravened Lindquist's rights under PUG's express terms included above in this claim.

## Claim #4: Breach of Contract: Failure to Intervene in Wrongful Dismissal

### (As against Pritikin, Prichard, and Nordstrom, in their official capacities)

24.    PUG's terms include, *inter alia*, due-process. PUG Catalog 17. The terms also include the right to report discrimination to "any administrator," *id*. 13 – who then presumably have a duty to act in good faith in handling the report. The terms also expressly cite PGLS's Office of Student Relations as where a student should address grievances about faculty and staff. *Id*.

25.    Here, Pritikin, Prichard, and Nordstrom are each either or both PUG and PGLS administrators, and each received personal notice, from Lindquist, of Moody's dismissal, *supra*, paras. 13-15. Yet, Pritikin, Prichard, and Nordstrom, refused to intervene and remedy the conduct.

7

*Id.* Instead, Prichard scolded Lindquist for the "tone" of Lindquist's grievance against Moody's wrongful dismissal of Lindquist. *Supra*, para. 13, ln. 22. A reasonable jury could find a duty to intervene existed for these defendants – and that the duty to intervene was *not* met by Pritikin and Nordstrom refusing to do anything, nor by Prichard scolding Lindquist about Lindquist's grievance against Moody's wrongful dismissal. Therefore, since Pritikin, Prichard, and Nordstrom acted officially, there is cause to litigate whether the failure to intervene against the wrongful dismissal breached the contract by contravening Lindquist's rights PUG's express terms included above in this claim.

**Claim #5: Breach of Contract: Moody's Retaliation**

**(As against Moody, in her official capacity)**

26. Retaliation is "[revenge] in return for actual or perceived . . . wrongs." *Retaliation*, Black's Law Dictionary (12th ed. 2024). PUG's terms include, *inter alia*, protection against retaliation: "Retaliation against any student using this complaint process is strictly prohibited." PUG Catalog 24. Here, Moody, a PGLS administrator, personally dismissed Lindquist, unilaterally and without due process, the day after Lindquist filed a grievance against Moody's racial and sexual discrimination. Moreover, Moody reported the grievance as the dismissal's basis. *Supra*, para. 12. Based on the dismissal's timing and basis, and no alternative explanations for the dismissal: a reasonable jury could find that the dismissal breached the contract as retaliation contravening Lindquist's rights under PUG's express terms included above in this claim, since Moody acted officially.

8

**Claim #6: Breach of Contract: Failure to Intervene Against Retaliation (As against Pritikin, Prichard, and Nordstrom, in their official capacities)**

27.    Retaliation is "[revenge] in return for actual or perceived . . . wrongs." *Retaliation*, Black's Law Dictionary (12th ed. 2024). PUG's terms include, *inter alia*, protection against retaliation: "Retaliation against any student using this complaint process is strictly prohibited." PUG Catalog 24. As analyzed in claim #5 above, Moody violated PUG's terms by dismissing Lindquist retaliatorily. PUG's terms include the right to report grievances to "any administrator," *id*. 13 – who then presumably have a duty to act in good faith in handling the report. The terms also expressly cite PGLS's Office of Student Relations as where a student should address grievances about faculty and staff. *Id*.

28.    Pritikin, Prichard, and Nordstrom are PUG or PGLS administrators, and each received personal notice, from Lindquist, of Moody's retaliation. *Supra*, paras. 13-15. Yet, Pritikin, Prichard, and Nordstrom, each refused to intervene and remedy the conduct. *Id*. Instead, Prichard scolded Lindquist for the "tone" of Lindquist's grievance against Moody's retaliation. *Supra*, para. 13, ln. 22. A reasonable jury could find a duty to intervene existed – and that the duty to intervene was *not* met by Pritikin and Nordstrom refusing to do anything, nor by Prichard scolding Lindquist about Lindquist's grievance against Moody's retaliation. Therefore, since Pritikin, Prichard, and Nordstrom acted officially, there is cause to litigate whether the failure to intervene against the retaliation breached the contract by contravening PUG's express terms included above in this claim.

9

## Claim #7: Breach of Contract: Prichard's Retaliation

### (As against Prichard, in her official capacities)

29.    Retaliation is "[reprisal] in return for actual or perceived . . . wrongs." *Retaliation*, Black's Law Dictionary (12th ed. 2024). PUG's terms include, *inter alia*, protection against retaliation: "Retaliation against any student using this complaint process is strictly prohibited." PUG Catalog 24. PUG's terms include the right to report grievances to "any administrator," *id.* 13 – who then presumably have a duty to act in good faith in handling the report. The terms also expressly cite PGLS's Office of Student Relations as where a student should address grievances about faculty and staff. *Id.* Claims #1, #3, and #5 above analyzed how Moody violated PUG's terms by racial and sexual discrimination, wrongful dismissal, and retaliation against Lindquist.

30.    Prichard directs PGLS's Office of Student Relations and received personal notice, from Lindquist, of Moody's racial and sexual discrimination, wrongful dismissal, and retaliation against Lindquist. Instead, Pritikin, Prichard, and Nordstrom, each refused to intervene and remedy the conduct. *Id.* Instead, Prichard scolded Lindquist for the "tone" with which Lindquist's grievance reported Moody's racial and sexual discrimination, wrongful dismissal, and retaliation against Lindquist. A reasonable jury could find that Prichard scolding Lindquist about Lindquist's grievance against Moody constituted retaliation against Lindquist's grievance. Therefore, since Prichard acted officially, there is cause to litigate whether Prichard breached the contract by retaliation, contravening PUG's terms included above in this claim.

10

**Claim #8: Breach of Contract: Failure to Intervene Against Retaliation**
**(As against Pritikin and Nordstrom, in their official capacities)**

31.    Retaliation is "[revenge] in return for actual or perceived . . . wrongs." *Retaliation*, Black's Law Dictionary (12th ed. 2024). PUG's terms include, *inter alia*, protection against retaliation: "Retaliation against any student using this complaint process is strictly prohibited." PUG Catalog 24. As analyzed in claim #7 above, Prichard violated PUG's terms by retaliating against Lindquist's grievance. PUG's terms include the right to report grievances to "any administrator," *id.* 13 – who then presumably have a duty to act in good faith in handling the report.

32.    Pritikin is a PGLS administrator and Nordstrom is a PUG administrator. Each have authority over Prichard, and each received personal notice, from Lindquist, of Prichard's retaliation. Yet, Pritikin and Nordstrom each refused to intervene and remedy the conduct. A reasonable jury could find a duty to intervene existed – and that the duty to intervene was *not* met by Pritikin and Nordstrom refusing to do anything about Prichard's retaliation against Lindquist. Therefore, since Pritikin and Nordstrom acted officially, there is cause to litigate whether the failure to intervene against the retaliation breached the contract by contravening PUG's express terms included above in this claim.

11

**Claim #9: Defamation**

**(As against PUG and PGLS)**

33.    Defamation arises by false communication that tends to deter another's association or dealing with third persons. *See* Restatement (Second) of Torts § 559. Here, either of both PUG and PGLS reported, to the Law School Admission Council (LSAC), that PGLS had duly dismissed Lindquist for misconduct. That report was false and solely deterred Trinity Law School from fully extending a tentative offer, to Lindquist, of free law school and a monthly stipend. Therefore, a reasonable jury could find that either or both PUG and PGLS defamed Lindquist by that false reporting to LSAC.

**Claim #10: Violation of Title-Six Civil Rights**

**(As against all defendants in their official capacities)**

34.    A Title-VI violation arises by a covered entity discriminating based on, *inter alia*, actual or perceived race, sex, and color. Title 6 of the 1964 Civil Rights Act. 42 U.S.C. § 2000d et seq. PUG and PGLS are covered entities because they receive federal funding. *Cf. id.*

35.    As analyzed in Claim #1 above, Moody's warning constituted racial and sexual harassment. As analyzed in Claim #2 above, Pritikin, Prichard, and Nordstrom refused to intervene against Moody's racial and sexual harassment against Lindquist. Therefore, a reasonable jury could find that Pritikin, Prichard, and Nordstrom abetted Moody's conduct against Lindquist and that the abetment constituted Title-VI violations against Lindquist's right to be free from racial and sexual harassment – and its systematic abetment by several PGLS administrators and an administrator at PUG.

12

## III.    RELIEF

Lindquist requests the following relief against PUG and PGLS:

36.    Injunction against PGLS, ordering PGLS to withdraw, from Lindquist's law-school report, PGLS's mischaracterization of Lindquist's law school performance, namely that PGLS duly dismissed Lindquist for misconduct.

37.    Compensatory damages equal to the tuition received by PGLS from Lindquist for the contract that PUG and PGLS breached: $14,000.

38.    Special damages for the breach of contract, equal to the approximate non-tuition costs that Lindquist incurred to attend law school leading up to PGLS's breach (books, tutoring, time-value of studying, etc.): $50,000.

39.    Compensatory damages, presumed under law, for PUG and PGLS's defamation: $100,000 or whatever the court would deem appropriate.

40.    Special damages for PUG and PGLS's defamation: $128,000 as the approximate value of the tentative offer that TLS revoked based solely on PUG and PGLS's defamation: $128,000 = 72,000 (the value of the offer's stipend: $1,500 per month for 48 months of law school, presuming excellent scholarship), plus $56,000 (the approximate cost of tuition, waived under the tentative offer, for four years of tuition at TLS).

41.    Exemplary damages for PUG and PGLS's defamation: $2,000,000 or whatever the court would deem appropriate.

42.    Pain, suffering, and litigation damages (PSLD) the court may direct.

43.    The total monetary award sought is $2,192,000, plus PSLD.

December 25, 2024                    /s/ Russell Floyd Lindquist

13